STATE HIGHWAY COMMISSION, Respondent

v.

J. H. BECKMAN CONSTRUCTION CO. et al., Appellants

(171 N.W.2d 504)

(File No. 10479. Opinion filed October 22, 1969)

**John E. Burke,** Sioux Falls, for dependants and appellants.

**Gordon J. Mydland,** Atty. Gen., **John B. Wehde,** Asst. Atty. Gen., Pierre, for plaintiff and respondent.

RENTTO, Judge.

In this action the state seeks a declaration of rights and duties under a contract awarded after competitive bidding for the building of a highway bridge, the terms of which were altered during the course of construction by agreement of the parties. It is principally interested in the legality of additional compensation allowed the contractor under the modification.

The State of South Dakota accepted the bid of J. H. Beckman Construction Company for the building of the bridge over the Grand River near Mobridge, South Dakota, and entered into a written contract with it for such construction. While the bridge was being built Mr. Beckman was killed in an airplane mishap. The assets of his company, including this contract, were sold to the other defendant G. H. Lindekugel & Sons. The state approved the assignment of the contract to Lindekugel and its assumption of responsibility for completion of the structure.

The superstructure of the bridge was to be supported by two sills, one on either bank of the river, and 31 bents or piers between the sills, in the river. These were to be of steel and reinforced concrete construction. The design of the bents had steel piling driven into the bed of the stream until required firmness was encountered. These supported the concrete footings on which rested the vertical concrete columns poured around the steel pilings. Some of the footings were planned to be built in the river bed and others above it.

The construction of the piers necessitated the use of a cofferdam. In the testimony this is described as a watertight enclosure made of interlocking steel segments driven into the stream bed, in the area where a pier was to be constructed. It was large enough so that when it was excavated and unwatered a pier could be built within it. Apparently after the construction was completed the cofferdam was disassembled and utilized in the building of another bent.

To provide a working area for use in placing the cofferdam and building the structure within it, Beckman utilized a causeway which was extended into the river as the work progressed. This was made by dumping dirt and rocks into the river until the upper surface of the accumulation was above water level and large enough for its purposes. In effect it was a roadway. In some instances contractors doing this kind of work use a floating barge as their working area. The contract did not prescribe the method to be used in this case. That was the choice of the party doing the work.

By utilizing the causeway it was necessary for the contractor in building the piers to sink the cofferdam through the causeway and into the bed of the stream. In order to construct the pier within it, it had to excavate material that had been placed into the causeway and in those situations where the footing was built in the river bed, materials in their natural position, and remove therefrom any water that had seeped into the enclosure. The construction of the piers in descending order from the highest numbered one, proceeded without serious incident until work was being done on bent 22. The cofferdam collapsed while it was being excavated and unwatered. There was some evidence that this was contributed to by a higher than anticipated level of water in the river occasioned by raising the pool level in the Oahe Reservoir.

At the request of the contractor a meeting was held at which this situation and problems arising therefrom were discussed by the contractor and its representatives with representatives of the Department of Highways. This was on May 3, 1963. It was there agreed that the elevation of the footing for bents 19 to 4, both inclusive, would be raised a distance of ten feet from the plan shown elevation, except two of them, which would be raised six feet. After this the parties executed written contract change orders embodying the modifications arrived at in their meeting.

One of these provides that excavation below the plan shown bottom of footing elevations, or bottom of footing elevations as

modified, would be paid for at 2 1/2 times the contract unit price paid for structure excavation which was $45 per cubic yard. Another stated that these structure excavations would be measured by the amount of rock used to fill the cofferdams below the footing lines using an agreed conversion factor. In other words, the contractor rather than building a form for the bottom of the concrete footing would utilize rock placed at the bottom of the cofferdams for this purpose. This was authorized for bents 19—4, both inclusive, and ratified as to bents 27—20, both inclusive. In the latter it had been done before the change order without prior written agreement, but with the knowledge and apparent consent of the state.

After this, work on the bridge progressed according to the original plan as amended. The contractor submitted periodic estimates of work done thereunder which were approved and paid. In due time the project was completed and accepted by the state. Before the final payment was made to the contractor some of the officials in the Department of Highways began to question the legality of payments made under the change order. As a result the final payment was held in abeyance and the question submitted to its legal department. Department counsel recommended the institution of this suit.

The trial court found that the cost of excavation of causeway materials for piers 27—20, inclusive, at the rate agreed on in the change order, amounted to $39,981.37, and for piers 19 to 4, inclusive, to $46,679.62. It also found that the cost of excavating natural ground for piers 27—20, inclusive, to be $10,-825.88 and for piers 19 to 4, inclusive, $6,937.88. It concluded that payment for excavating natural ground for all the piers involved was provided for in the contract and that the state was liable therefor, but not for excavating materials which the contractor had placed in the causeway because such would be unauthorized as constituting double payment. Judgment was entered accordingly from which the contractor appeals.

The state in its appeal brief complains of being held liable for the excavation of natural ground done before the execution

of the change order, claiming that such payment is retroactive in nature in violation of our constitutional provision. Art. XII, § 3. Since it has not cross appealed from any part of the determination and is here only as a respondent, the question which it seeks to raise is not before us. Peter Mintener Lumber Co. v. Janisch, 44 S.D. 42, 181 N.W. 914. No complaint appears to be made of the determination made as to similar excavation done after the execution of the change order.

Constitutional and statutory provisions place limitations on the contracting power and authority of the State Highway Commission of which those who deal with it are charged with notice. Cuka v. State, 80 S.D. 232, 122 N.W.2d 83. One of the most obvious of these is that its contracts must be let upon competitive bidding. SDCL 1967 31-5-10. However, it is consistent with this requirement that such contracts contain a provision permitting modification thereof by the parties without necessity of readvertising when a change in the plans is found necessary. England v. State, 61 S.D. 132, 246 N.W. 628; Kansas City Bridge Co. v. State, 61 S.D. 580, 250 N.W. 343; Griffis v. State, 69 S.D. 439, 11 N.W.2d 138. But changes in the contract can then be made only as authorized thereby.

There is such a stipulation in this contract. It appears as Section 4.3 of the department's specifications and special provision, which by reference are made an essential part of the contract. As amended, it is as follows:

"ALTERATION OF PLANS OR OF CHARACTER OF WORK—The Engineer shall have the right to make alterations in plans or character of work as may be considered necessary or desirable during the progress of the work to complete satisfactorily the proposed construction. Such alterations shall not be considered as a waiver of any conditions of the contract nor invalidate any of the provisions thereof.

The right is reserved to increase or decrease any or all of the items in the estimate of approximate quan-

tities as shown in the bid schedule, or to eliminate any one or more items. The length of the project may be increased or decreased by adding or omitting sections or by relocation. However, an approved change order must be obtained in advance of any and all changes in item quantities.

Whenever the termini of the project are changed and whenever any change or combination of changes results in increasing or decreasing the original amount as calculated from the bid quantities and contract unit prices by more than twenty-five (25) per cent, a supplemental agreement, acceptable to both parties to the contract, may be demanded by either party and shall be executed in advance of performing the affected work. In case no supplemental agreement is requested in writing prior to the performance of the work, the original contract prices shall govern the final settlement regardless of the amount of the difference from the original contract amount.

When an overrun or underrun of more than twenty-five (25) per cent of the original bid quantity for one or more major contract items occurs, either party to the contract may demand that a supplemental agreement be negotiated with an adjustment of unit price or prices satisfactory to both parties. The adjusted unit price for a major contract item shall apply to the entire final quantity when the adjustment has been made as a result of an underrun of more than twenty-five (25) per cent and as a result of an overrun shall apply only to the quantity of work performed in excess of one hundred twenty-five (125) percent of the original contract quantity.

When an overrun or underrun of more than fifty (50) per cent of the original bid quantity for one or more minor contract items occurs, either party to the contract may demand that a supplemental agreement be negotiated with an adjustment of unit price or prices satisfac-

tory to both parties. The adjusted unit price for a minor contract item shall apply to the entire final quantity when the adjustment has been made as a result of an underrun of more than fifty (50) per cent and as a result of an overrun shall apply only to the quantity of work performed in excess of one hundred-fifty (150) per cent of the original contract quantity.

In case no supplemental agreement is requested in writing prior to the performance of the work, the original contract prices shall govern in the final settlement regardless of the amount of the difference from the original contract amount.

Whenever an alteration in character of work involves a substantial change in the nature of the design or in the type of construction which materially increases or decreases the cost of the performance, the work shall be performed in accordance with the specifications and as directed; provided, however, that before such work is started a supplemental agreement, acceptable to both parties to the contract, shall be executed.

In all other cases the work involved in any changes shall be performed on the basis of the contract unit prices and no supplemental agreement shall be necessary, other than approved change orders.

Excavation for Structures, Timber Piling, Pile Shoes and items with unit prices predetermined by the Department, and included in the specifications and/or the proposal, such as water on grading projects, will not be subject to negotiation by supplemental agreement regardless of the amount of variation from the original contract quantity."

It is not disputed that the contractor placed materials were excavated under piers 27 to 20, inclusive, prior to the execution of

the change order concerning it. Since this was contrary to the quoted provision the state could not be liable therefor.

The state takes the position that the provisions of 4.3 are conditions precedent which must exist before changes can be made in one of these contracts. This we think is a sound view. McQuillin—Municipal Corporations, 1966 Revised Vol. 10, § 29.121. From this it proceeds to urge that the required conditions were not here present when the changes in question were made and that consequently they are invalid.

The validity of the change order in question is dependent on the resolution of this issue. The contractor proposed a finding that the change order was binding on the state. This is essential to its cause. It was refused. There is no finding concerning it and no other clear indication that the issue was passed on by the trial court. Without a determination of this issue the record is insufficient, requiring a reversal of a portion of the judgment. Essington v. Buchele, 79 S.D. 544, 115 N.W.2d 129. If the evidence concerning it were undisputed, as asserted by the state, it would be proper for us to make the determination as a matter of law. However, from a study of the record we are persuaded that the evidence bearing on it is such that we could not properly do so.

Therefore the part of the judgment concerning contractor placed materials removed after the change order is reversed and the case remanded to the trial court to make findings on this issue, and upon its conclusions based thereon, enter judgment accordingly. This to be done upon the present record without a new trial or other proceedings below.

All the Judges concur.